Filed 5/22/23  In re A.D. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re A.D. et al., Persons Coming Under the Juvenile Court Law. | B318696 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.R. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. Nos. 18CCJP07070C–D) |

APPEAL from an order of the Superior Court of Los Angeles County.  Mary E. Kelly, Judge.  Conditionally affirmed and remanded with directions.

California Appellate Project, under appointment by the Court of Appeal, for Defendant and Appellant M.R.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant R.B.

Dawyn R. Harrison, County Counsel, Kim Nemoy,

Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

M.R. (Mother) and Robert B. (Father) appeal from the juvenile court's dispositional order, declaring their children dependents of the court under Welfare and Institutions Code[1] section 300, subdivisions (a) and (b), and removing them from parental custody. Mother argues the court abused its discretion in ordering her to participate in a domestic violence support group for victims. Both parents assert the court and the Los Angeles County Department of Children and Family Services (Department) failed to comply with the applicable provisions of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law. We conclude the juvenile court did not abuse its discretion in requiring Mother to participate in a domestic violence support group as part of her reunification services. However, the Department concedes, and we agree, that the ICWA inquiry was inadequate. Accordingly, we conditionally affirm the dispositional order and remand for ICWA compliance.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mother has two children that are the subject of the current proceedings: A.D., a girl born in November 2012, and R.B., a boy born in December 2017. Father is the father of R.B. L.D., who is nonoffending and not a party to this appeal, is the father of A.D. Mother also has an older child, M.M., from a prior relationship.

_____

[1]  Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

2

## I.    Prior Child Welfare History

The family has a history with the dependency system.  In 2011, the juvenile court sustained a petition filed on behalf of the children's half-sibling, M.M., under section 300, subdivisions (a) and (b).  The court found that M.M. had sustained a leg fracture consistent with nonaccidental trauma, the parents had failed to obtain necessary treatment for the child's cerebral palsy, and the parents had an unresolved history of domestic violence, including in the child's presence.  In 2013, parental rights over M.M. were terminated, and the child was adopted by the paternal grandmother.

In 2013, the juvenile court sustained a petition filed on behalf of A.D. under section 300, subdivisions (b) and (j).  The court found that Mother had a history of substance abuse and had tested positive for marijuana on the day of A.D.'s birth. The court also found that A.D. was at risk of serious physical harm based on the prior nonaccidental injury sustained by her half-sibling, M.M.  Following the child's removal, Mother was able to reunify with A.D., and the court terminated its jurisdiction in 2014.

## II.    Current Dependency Petition

The current matter came to the Department's attention in June 2020 based on a referral alleging the general neglect of A.D. and R.B. by Mother.  According to the reporting party, Mother was incoherent and rambling during a recent telephone call with the maternal grandmother.  Mother and the children had been staying with a friend, and Mother believed they were not safe at that residence because she was being targeted for retaliation by a gang.

After several attempts, a social worker for the Department was able to interview Mother at the maternal grandmother's home. Mother reported that Father had been threatening her because she "snitched" about a robbery and no longer wanted to be in a relationship with him. According to Mother, Father was a gang member and a pimp, and had a recent arrest for violating his probation. When asked about any domestic violence with Father, Mother disclosed that he had hit her in front of A.D. on two occasions. Father also choked Mother and struck her with the back of his hand when she was pregnant with R.B. Father lived in both Texas and Los Angeles, and Mother did not have his contact information. With respect to A.D.'s father, L.D., Mother reported that he also lived in Los Angeles, and she only had minimal contact with him through Facebook. Mother stated that L.D. was the person who inflicted the injury on her oldest child, M.M., when L.D. accidentally pulled the child's leg out of its socket as they were playing.

Mother admitted that she had a history of drug use, including methamphetamines and marijuana. She stopped using methamphetamines in 2010. She currently smoked marijuana, but only did so outside the home when the children were with the maternal grandmother. Mother denied having any mental health issues. She stated, however, that "weird things" involving light bulbs had happened at her friend's home where she and the children had been staying. Mother acknowledged that she had been drinking alcohol on the day that she became paranoid about the light bulbs. Both A.D. and R.B. were with Mother at the time she was drinking, but were asleep.

In an interview with the social worker, the maternal grandmother reported that Mother and the children had been

4

residing in her home for about a week. While they were staying with Mother's friend, Mother called the maternal grandmother because she believed that someone was waiting outside the home to hurt her and the children. The maternal grandmother had not previously seen Mother act in such a paranoid manner. While R.B. was too young to make a statement, A.D. indicated that she felt safe living with Mother and did not have any concerns in her care.

At the Department's request, Mother participated in an Up Front Assessment. The assessor reported a number of concerns about Mother's current situation. Mother had lacked stable housing for a significant period of time, and she recently had been living in an unhealthy environment for the children. She also admitted she used marijuana on a daily basis, and the drug could make her paranoid. In addition, Mother had a history of childhood trauma and abusive relationships, and appeared to have mental health issues that had not been addressed.

On September 1, 2020, the Department filed a dependency petition on behalf of the children under section 300, subdivisions (a) and (b). The petition alleged the children were at substantial risk of harm based on the history of domestic violence between Mother and Father, Mother's history of substance abuse and current use of marijuana, and Mother's history of mental and emotional problems. At a detention hearing held on September 4, 2020, the juvenile court released the children to Mother on the condition that she and the children reside with the maternal grandmother. The court also ordered Mother to submit to on-demand drug testing. The matter was set for an adjudication hearing.

### III. Adjudication Hearing

For its November 2020 jurisdiction/disposition report, the Department interviewed Mother and A.D. about the allegations in the petition. Mother admitted she had a history of domestic violence with multiple partners. She first experienced domestic violence in her relationship with M.M.'s father. They also used methamphetamines together, and Mother eventually ended the relationship because M.M.'s father continued to consume drugs. Mother again experienced domestic violence in her relationship with Father. In 2017, when Mother was pregnant with R.B., Father "backhanded" her during a dispute over prostitutes and money. On another occasion, Father choked Mother and struck her. She denied that A.D. was present during these incidents. Mother decided to leave Father because of his criminal lifestyle. With respect to her drug use, Mother reported that she began using methamphetamines as a teenager, but had stopped years ago because of her children. While she continued to smoke marijuana, she recently had stopped using that drug as well because she realized it made her paranoid. With respect to her mental health, Mother denied she had any history of mental or emotional problems. She noted that she had been raising the children on her own, and that they were doing well in her care.

In her interview with the Department, A.D. indicated that she once heard Father hitting Mother. While the child did not see the altercation, she could hear Father and Mother fighting, and felt scared because she thought Father might have a knife. A.D. did not know whether Mother used drugs or alcohol, but denied that she ever saw Mother act in strange manner.

In a series of last minute information for the court reports, the Department provided updates on its contacts with the family.

In December 2020, the social worker had a call with Father, who was incarcerated for a parole violation. He denied he ever engaged in domestic violence against Mother, and did not know if Mother abused drugs or had any mental or emotional problems. In March 2021, the social worker spoke with A.D.'s father, L.D., who also denied knowledge of any domestic violence, drug abuse, or mental health issues involving Mother. Both Father and L.D. indicated that they wanted to participate in the proceedings.

Since the detention hearing, Mother had been participating in individual therapy. She had not, however, been compliant with the juvenile court's order for on-demand drug testing. Between June 2020 and May 2021, Mother tested negative for drugs on three occasions, but failed to appear for numerous other tests. In May 2021, she called the police while the children were in her care because she was experiencing paranoia.

On June 24, 2021, the juvenile court held the adjudication hearing. The court sustained the petition, as amended, under section 300, subdivisions (a) and (b). The court found true the allegation that Father and Mother had a history of engaging in violent physical altercations, which placed the children at substantial risk of harm. The court also found true the allegations that Mother had a history of substance abuse and mental and emotional problems, which impaired her ability to provide the children with regular care and supervision. The court ordered that the children remain released to Mother under the Department's supervision. The court also ordered Mother to continue to submit to on-demand drug testing. The matter was continued for the dispositional hearing.

## IV. Supplemental Dependency Petition

On July 7, 2021, the Department detained the children from Mother after she tested positive for methamphetamines in a recent drug test. When the social worker informed Mother of the result, she indicated that she had taken a pill that she found in the maternal grandmother's bathroom. Although Mother later identified the pill as phenylephrine, the lab that performed the drug test reported that such medication would not cause a positive result. During this period of supervision, Mother continued to attend therapy, but had stopped participating in other family preservation services, including parenting education and a drug abuse program. Mother's therapist reported that their sessions were focused on addressing Mother's past trauma and discussing coparenting dynamics, given that Mother wanted the children's fathers to remain involved in their lives.

On July 9, 2021, the Department filed a supplemental petition on behalf of the children under section 387. The petition alleged that Mother continued to abuse methamphetamines, and consistently failed to submit to drug testing and to participate in family preservation services. At a detention hearing held on July 14, 2021, the juvenile court detained the children from Mother pending the dispositional hearing.

## V. Dispositional Hearing

As of December 2021, the children had been placed with a maternal great aunt, L.E. Although Mother had been granted monitored visitation with the children, she had not been visiting them on a consistent basis. L.E. also reported that Mother recently had been spending time with Father. While Mother remained enrolled in individual therapy, she repeatedly failed to appear for drug testing. By March 2022, Mother was no longer in

contact with the Department and had only sporadic visits with the children. Neither Father nor L.D. had maintained contact with the Department, or made any effort to visit their children.

On April 5, 2022, the juvenile court held the dispositional hearing. The court declared A.D. and R.B. dependents of the court under section 300, subdivisions (a) and (b), removed them from the custody of their parents, and ordered that they be suitably placed under the supervision of the Department. The court also granted each parent monitored visitation and reunification services. Mother's case plan included a full drug and alcohol program, on-demand drug testing, and individual counseling to address case issues. Over Mother's objection, the case plan also required her to participate in a domestic violence support group for victims.

## VI.  ICWA Investigation

At the September 4, 2020 detention hearing, Mother submitted a Parental Notification of Indian Status (ICWA-020) form in which she checked a box indicating that she did not have Indian ancestry as far as she knew. Mother's counsel also informed the court that Mother did not have any Indian ancestry. The court deferred a determination of whether ICWA applied pending the fathers' appearance.

In its jurisdiction/disposition report, the Department noted that Mother had denied Indian ancestry during a November 2020 interview. In a subsequent interview with the Department in July 2021, Mother was again asked about Indian ancestry. At that time, Mother reported that she thought she had Indian ancestry on the maternal grandfather's side of the family, but she was not sure. During the proceedings, the Department had multiple interviews with the maternal grandmother and the

9

maternal great aunt, L.E., and had contact information for a maternal aunt, R.V. There is no indication in the record that the Department made any ICWA inquiry of these maternal relatives.

With respect to Father, the Department interviewed R.B.'s paternal grandmother in March 2021 to inquire whether the family had any Indian ancestry. R.B.'s paternal grandmother stated, "As far as my side of the family, I know my great great grandmother was Native American but I don't know what tribe." She denied that this ancestor was ever enrolled in a tribe or lived on a reservation, and she was not aware of any other relatives who might have additional information. R.B.'s paternal grandmother did not know about Indian ancestry on the paternal grandfather's side of the family, and suggested that the Department ask Father to inquire of R.B.'s paternal grandfather.

Father made his first appearance in the case at the June 24, 2021 adjudication hearing. On that date, he submitted an ICWA-020 form in which he checked a box indicating that none of the categories of Indian status applied. At the hearing, his counsel advised the court that Father "feels there could be some type of Indian ancestry," but he had no specific information to provide. The court ordered the Department to conduct a further inquiry.

In July 2021, the Department asked Father if he had any Indian ancestry. Father stated that he did, but he was not sure "what kind." When the Department later asked Father if he had additional information about ICWA, he indicated that he did not because all of the elders in his family were deceased. The Department also followed up with R.B.'s paternal grandmother, who confirmed that she did not have any further information

10

about ICWA. However, she advised the Department to contact R.B.'s paternal great-grandmother, M.Y.

The Department interviewed M.Y. in July 2021. When the social worker asked her about the family's Indian ancestry, M.Y. stated, "Oh, honey, you're expecting too much from me. I don't have many details. I just know it was my grandfather's mother that was Native American but that is it. I don't know what tribe or anything." Later that month, M.Y. informed the Department that R.B.'s great-great-great-great-grandmother was Navajo. M.Y. also disclosed that she had spoken with a cousin who confirmed that the family had Navajo heritage. M.Y. provided the names and birth places of R.B.'s great-great-great grandparents and his great-great-great-great grandmother, D.S.

In August 2021, the Department mailed a set of ICWA notices to the Navajo Nation, the Ramah Navajo Chapter of the Navajo Nation, the Bureau of Indian Affairs (BIA), and the Secretary of the Interior. The notices included the biographical information that M.Y. had provided about R.B.'s ancestors, including D.S. In a September 2021 letter, the Navajo Nation responded that it had been unable to verify R.B.'s eligibility for tribal membership enrollment based on the ancestry information provided, and that it was closing the referral. In a December 2021 letter, the Ramah Navajo Chapter responded that it did not have access to the Navajo Nation's complete membership records, and that the Department should refer to the Navajo Nation's ICWA response as the determining letter. In March 2022, the BIA indicated in an e-mail that it did not determine tribal eligibility, and that such information must be obtained from the tribe itself. The BIA also stated that an ICWA response would be mailed to the Department, and that it could not send a response

via e-mail.  As of the April 5, 2021 dispositional hearing, the Department had not received the BIA's mail response.

With respect to A.D.'s father, L.D., he submitted an ICWA-020 form on March 25, 2021, in which he checked a box indicating that he did not have Indian ancestry as far as he knew.  In a March 2021 interview with the Department, L.D. also denied having any Indian ancestry.  At the June 24, 2021 adjudication hearing, however, L.D.'s counsel informed the court that L.D. believed that A.D.'s paternal great-grandmother was Cherokee.  In July 2021, the Department spoke with A.D.'s paternal grandmother, who stated, "We got a little Indian but that is all I know."  A.D.'s paternal grandmother reported that she had learned this information from the paternal great-grandmother, but was never told the name of the tribe or the relative with Indian ancestry.  She also was not aware of any living relatives who might have additional information.

At the April 5, 2021 dispositional hearing, the Department asked the juvenile court to find that ICWA did not apply.  The court initially expressed concern that the Navajo Nation's response was not a definitive statement of R.B.'s ineligibility for tribal membership, but then stated that it was "taking that [response] as a refusal."  The court continued to express concern, however, that the Department had not received a formal response from the BIA, and that the BIA's e-mail correspondence was not conclusive as to R.B.'s lack of tribal membership eligibility. The court ordered the Department to follow up with the BIA, and deferred making a determination on the applicability of ICWA pending further information about the BIA's response.

Both Mother and Father filed timely appeals.

## DISCUSSION

On appeal, Mother argues the juvenile court abused its discretion in ordering her to participate in a domestic violence support group for victims. In addition, both Mother and Father contend the juvenile court failed to ensure that the Department complied with its duty of further inquiry by interviewing known and available extended family members about their respective claims of Indian ancestry.[2] We conclude the juvenile court acted within its broad discretion in ordering Mother to participate in a domestic violence support group as part of her reunification services. However, as the Department concedes, remand is required in this case for full compliance with ICWA.

## I. The Juvenile Court Did Not Abuse Its Discretion in Ordering Mother to Participate in a Domestic Violence Support Group

Mother challenges the portion of the juvenile court's dispositional order requiring her to participate in a domestic violence support group for victims. Mother claims the order was unreasonable because she was already addressing her past trauma in therapy, and the support group requirement was not tailored to the family's unique needs. We disagree.

When fashioning a dispositional order, the juvenile court may make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." (§ 362, subd. (a).) The court also may "direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings . . . as the court deems necessary and proper to carry

---

[2] Neither Mother nor Father contend that there was any inquiry error with respect to L.D.'s claim of Indian ancestry.

out this section," including orders "to participate in a counseling or education program." (*Id*., subd. (d).) "At disposition, the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.] Instead, the court may consider the evidence as a whole." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.) " '[T]he juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion.' " (*In re Corrine W.* (2009) 45 Cal.4th 522, 532.)

Here, the juvenile court acted well within its discretion in requiring Mother to participate in a domestic violence support group as part of her reunification services. Mother admitted that she had a history of domestic violence with multiple partners. In a prior case, the court assumed jurisdiction over Mother's oldest child, M.M., based, in part, on the parents' unresolved history of domestic violence. Mother failed to reunify with M.M., and her parental rights over the child were terminated. In the present case, the court assumed jurisdiction over A.D. and R.B. based, in part, on the violent physical altercations that occurred between Mother and Father in which Father slapped, choked, and struck Mother. The altercations took place in the presence of A.D. when Mother was pregnant with R.B. While Mother was forthcoming with the Department about the nature of the abuse perpetrated by Father, she appeared to minimize its seriousness, telling the social worker that "[t]his is from 2017 though." She also gave conflicting accounts as to whether A.D. witnessed the abuse. Mother initially told the social worker that Father hit her in front

14

of A.D. on two occasions, but later denied that A.D. was ever present during these incidents.

Mother argues that the order requiring her to attend a domestic violence support group for victims was an abuse of discretion because the incidents of domestic violence were remote in time, and she was no longer in a relationship with any of the perpetrators as of the dispositional hearing. She also asserts that she was consistently participating in therapy to address her past trauma, and that her therapist never recommended a domestic violence support group as part of her mental health services. There was evidence, however, that Mother had not been able to fully extricate herself from the relationship with Father. When the Department first interviewed Mother, she reported that Father had been threatening her because, among other reasons, she no longer wanted to be in a relationship with him. Later in the proceedings, as the dispositional hearing date approached, the maternal great-aunt told the Department that Mother had been spending time with Father, including visiting Father out of state instead of celebrating the children's birthdays with them. Moreover, Mother's therapist disclosed that she and Mother had been discussing coparenting dynamics in therapy due to Mother still wanting the children's fathers to be involved in their lives.

Given the totality of this record, the juvenile court reasonably could conclude that Mother was unable to fully appreciate the risk of harm that domestic violence posed to the children and to understand how to best protect the children from that risk. The juvenile court accordingly did not abuse its discretion in ordering Mother to attend a domestic violence support group for victims as part of her reunification plan.

## II.  Remand Is Required for ICWA Compliance

Both Mother and Father argue that the juvenile court and the Department failed to comply with the inquiry provisions of ICWA and related California law.  They specifically assert that the Department failed to conduct an adequate further inquiry into their claims of Indian ancestry, and that the court failed to ensure a proper inquiry was made.  The Department concedes that there is no record of inquiry being made of several known maternal and paternal relatives, and that the matter must be remanded for compliance with ICWA.  We agree.

### A.  Governing Law

"ICWA reflects a congressional determination to protect American Indian children and to promote the stability and security of Indian tribes and families."  (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)  To that end, ICWA mandates that "[i]n any involuntary proceeding in a [s]tate court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and the right to intervene.  (25 U.S.C. § 1912(a).)  Similarly, California law requires notice to the child's parent, Indian custodian, if any, and the child's tribe if there is "reason to know . . . that an Indian child is involved" in the proceeding.  (§ 224.3, subd. (a).)

Both juvenile courts and child protective agencies "have an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child."  (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 14 ["juvenile court has an affirmative and

16

continuing duty in all dependency proceedings to inquire into a child's Indian status"].) " 'This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.' " (*In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 402.)

California law provides that the duty to inquire "begins with the initial contact" (§ 224.2, subd. (a)) and requires the juvenile court and child protective agency to ask all relevant involved individuals whether the child is or may be an Indian child (*id.*, subds. (a)–(c)). At the first appearance of each party, the court must inquire whether that party "knows or has reason to know that the child is an Indian child," and must "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." (*Id.*, subd. (c).) Additionally, when the agency takes a child into temporary custody, it must inquire of a nonexclusive group that includes the child, the parents, and extended family members "whether the child is, or may be, an Indian child." (*Id.*, subd. (b)). Extended family members include adults who are the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

If the juvenile court or the child protective agency "has reason to believe that an Indian child is involved in a proceeding, but does not have sufficient information to determine that there is reason to know that the child is an Indian child," the court or social worker "shall make further inquiry regarding the possible Indian status of the child . . . as soon as practicable." (§ 224.2, subd. (e).) "[R]eason to believe" means the court or social worker has information "suggesting that either the parent of the child or

17

the child is a member or may be eligible for membership in an Indian tribe." (*Id*., subd. (e)(1).) "Further inquiry includes, but is not limited to . . . [¶] [i]nterviewing the parents, Indian custodian, and extended family members," and "[c]ontacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility." (*Id*., subd. (e)(2)(A), (C).)

"If the [juvenile] court makes a finding that proper and adequate further inquiry and due diligence . . . have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that [ICWA] does not apply to the proceedings, subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).) We generally review the juvenile court's ICWA findings under the substantial evidence test, " ' "which requires us to determine if reasonable, credible evidence of solid value supports the court's order." ' " (*In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 401.)

## B. The Matter Must Be Remanded Because the Department Did Not Adequately Investigate the Mother and Father's Claims of Indian Ancestry

In this case, the parents' respective claims that they believed they had Indian ancestry triggered the Department's duty to conduct further inquiry into the possible Indian status of the children. Although Mother initially denied having any Indian ancestry in her statements to the Department and the juvenile court, she later told the Department that she thought she had Indian ancestry on the maternal grandfather's side of the family. Likewise, while Father indicated in his ICWA-020 form none of the categories of Indian status applied, his counsel informed the court at the adjudication hearing that Father "feels

18

there could be some type of Indian ancestry." Father also told the Department in a subsequent interview that he did have Indian ancestry, but he was not sure "what kind." In addition, in an interview with the Department prior to the adjudication hearing, R.B.'s paternal grandmother indicated that the child's great-great-great-great-grandmother was Native American, although she did not know which tribe. These statements from Mother, Father, and R.B.'s paternal grandmother were sufficient to require the Department to conduct further inquiry into whether A.D. and R.B. might be Indian children. (See *In re Josiah T.*, *supra*, 71 Cal.App.5th at p. 404 [paternal grandmother's statement that she had Cherokee ancestry through her grandmother triggered duty of further inquiry]; *In re T.G.* (2020) 58 Cal.App.5th 275, 292 [mother's statement indicating possible Indian ancestry through her paternal grandfather triggered duty of further inquiry].)

With respect to Mother's claim of Indian ancestry, the record reflects that the Department failed to make any inquiry of known and available maternal relatives. During the course of the proceedings, the Department maintained contact with both the maternal grandmother and the maternal great-aunt, L.E., and the children were placed in the homes of these two relatives at various times. The Department also had contact information for the maternal aunt, R.V. There is no indication in the record, however, that the Department ever made any ICWA inquiry of these extended family members.

With respect to Father's claim of Indian ancestry, the record demonstrates that the Department did interview R.B.'s paternal grandmother and paternal great-grandmother, M.Y., about their family's Indian ancestry. Based on M.Y.'s statements

19

that R.B.'s great-great-great-great-grandmother was Navajo, the Department contacted the Navajo tribe, the BIA, and the Secretary of the Interior, and received a response from the tribe that it was unable to verify R.B.'s eligibility for tribal membership based on the ancestry information provided. As Father points out, however, it appears the Department never made any inquiry of the unnamed paternal cousin whom M.Y. had contacted to obtain information about the family's Navajo heritage. The record also is silent as to whether the Department tried to contact R.B.'s paternal grandfather to determine if the paternal side of Father's family had any Indian ancestry. Although the paternal grandmother had recommended that the Department ask Father to inquire of R.B.'s paternal grandfather, there is no indication that the Department ever attempted to do so.

On this record, the Department failed to fully comply with its duty of further inquiry. Despite this lack of compliance, the Department asked the juvenile court at the dispositional hearing to find that ICWA did not apply based on the inquiry that had been made. The court declined to make an ICWA finding at that time, however, because the Department had not yet received a formal response from the BIA about R.B.'s possible Navajo ancestry. While the court ordered the Department to follow up with the BIA, it did not direct the Department to conduct further inquiry by interviewing known and available maternal and paternal relatives about the parents' respective claims of Indian ancestry. Accordingly, as of the dispositional hearing, the court had failed to ensure that the Department had conducted an adequate further inquiry.

Appellate courts have adopted several divergent standards for determining whether the failure to comply with the duty of *initial* inquiry constitutes prejudicial error. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611–618 [describing four approaches for assessing prejudice at the initial inquiry stage and adopting a fifth, injury-focused standard].) Some courts also have concluded that the same standard of prejudice should apply to both initial inquiry and further inquiry errors. (See *In re E.C.* (2022) 85 Cal.App.5th 123, 155; *In re Rylei S.* (2022) 81 Cal.App.5th 309, 324–325.) In this case, however, we need not decide which standard of prejudice applies. The Department concedes, and we agree, that remand for full compliance with ICWA and related California law is the proper remedy here.

As discussed, once Mother and Father indicated that they believed they had Indian ancestry, the Department had a duty to conduct further inquiry into whether A.D. and R.B. might be Indian children, and the juvenile court had a duty to ensure an adequate inquiry was made. The record establishes that there were several maternal and paternal extended family members who either were known to the Department based on their prior contacts, or had been identified as persons who were likely to have information about the children's Indian ancestry. Because there is nothing in the record to suggest that the Department attempted to interview any of these relatives about the children's possible Indian status, or had been ordered to do so by the court, remand is required for a proper and adequate further inquiry.

## DISPOSITION

The juvenile court's dispositional order is conditionally affirmed, and the matter is remanded for compliance with ICWA and related California law. On remand, the juvenile court must

21

promptly direct the Department to conduct further inquiry into the children's possible Indian ancestry, including interviews with known and available extended family members and any other persons who may reasonably be expected to have information regarding the children's tribal membership or eligibility. If that information establishes a reason to know that an Indian child is involved, notice must be provided in accordance with ICWA and section 224.3. The Department shall thereafter notify the court of its actions and file certified mail return receipts for any ICWA notices that were sent, together with any responses received. The court must determine, on the record, whether the ICWA inquiry and notice requirements have been satisfied and whether A.D. or R.B. is an Indian child. If the court determines that A.D. or R.B. is an Indian child, it must vacate its dispositional order and conduct a new dispositional hearing, as well as all further proceedings in accordance with ICWA and related California law. If not, the court's original dispositional order shall remain in effect.


                                        VIRAMONTES, J.


We concur:




    GRIMES, Acting P. J.              WILEY, J.




22